*Judge Berman*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**'07 CIV 10275**

------------------------------------------------------------ x
LUMINENT MORTGAGE CAPITAL, INC.;  :
MINERVA MORTGAGE FINANCE          :
CORPORATION; MERCURY MORTGAGE     :
FINANCE STATUTORY TRUST; and SATURN :
PORTFOLIO MANAGEMENT, INC.,       :   Civ. A. No.
                                  :   ECF CASE
                Plaintiffs,       :
                                  :   Jury Trial Demanded
        v.                        :
                                  :
                                  :
BARCLAYS CAPITAL INC.,            :
                                  :
                Defendant.        :
                                  :
------------------------------------------------------------ x

## COMPLAINT

Plaintiffs LUMINENT MORTGAGE CAPITAL, INC. ("Luminent"), MINERVA MORTGAGE FINANCE CORPORATION ("Minerva"), MERCURY MORTGAGE FINANCE STATUTORY TRUST ("Mercury") and SATURN PORTFOLIO MANAGEMENT, INC. ("Saturn," and collectively with Luminent, Minerva, and Mercury, "Plaintiffs"), by and through their undersigned attorneys, as and for their Complaint against Defendant BARCLAYS CAPITAL INC. ("Barclays" or "Defendant"), hereby allege as follows:

### PARTIES

1. Plaintiff Luminent is a Maryland corporation having its principal place of business at 101 California Street in San Francisco, California 94111.

2. Plaintiff Minerva is a Maryland corporation that is an indirect subsidiary of Luminent having its principal place of business at 101 California Street in San Francisco, California 94111.

3. Plaintiff Mercury is a Maryland Business Trust that is a subsidiary of Luminent having its principal place of business at 101 California Street in San Francisco, California 94111.

4. Plaintiff Saturn is a Delaware corporation that is an indirect subsidiary of Luminent having its principal place of business at 101 California Street in San Francisco, California 94111.

5. Upon information and belief, Defendant is a Connecticut corporation having its principal place of business at 200 Park Avenue, New York, New York 10018.

## JURISDICTION AND VENUE

6. There is complete diversity of citizenship between the parties, and the amount in controversy is in excess of $75,000, exclusive of interest and costs. Therefore, the Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

7. Venue is proper pursuant to 28 U.S.C. § 1391(a) in that Defendant resides in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## NATURE OF THE ACTION

8. This action for damages arises out of Defendant's egregious attempt to exploit recent adverse conditions in the credit markets and wrongfully confiscate value contained in certain bonds Plaintiffs had effectively posted with it as collateral, while crediting Plaintiffs with a mere fraction of those bonds' actual worth. Defendant attempted to deprive Plaintiffs of the true value of those bonds by willfully breaching, without justification, repurchase agreements that required it to sell those securities, if at all, only in a commercially reasonable manner, and to otherwise act in good faith.

9. More specifically, Defendant accomplished its money-grab at Plaintiffs' expense by falsely discounting and misrepresenting the true value of the bonds and misrepresenting its liquidation efforts in order to misappropriate a significant portion of the securities' value by (i) falsely claiming to have sold certain of them to unidentified "3rd-parties" at unreasonably low prices, and/or (ii) assigning, in bad faith, unreasonably low values to certain of the bonds it did not purport to sell to a "3rd Party" (and then crediting Plaintiffs' accounts merely in the amount of such improper amounts).

10. Worse still, Defendant's wrongful conduct followed a prior breach of one of its agreements with Saturn in which Defendant refused to honor a repurchase trade regarding a bond it had issued, and then lied about its reasons for its refusal, forcing Saturn to ultimately sell the bond back to Defendant at an artificial discount.

## COMMON ALLEGATIONS

11. Luminent is a real estate investment trust with operations in Philadelphia, Pennsylvania. Minerva, Mercury and Saturn are qualified real estate investment trust subsidiaries of Luminent.

12. As part of their businesses, Plaintiffs purchase and sell securities and, in connection with such transactions, sometimes enter into so-called "repurchase agreements."

13. Barclays describes itself as "the investment banking division of Barclays Bank PLC, a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP." Upon information and belief, Barclays is a registered broker-dealer engaged in the business of, *inter alia*, buying and selling securities and, in connection with such activity, often enters into so-called "repurchase agreements."

14. Repurchase agreements are a common financing tool that permit a buyer of a security to obtain temporary financing for the purchase price by effectively borrowing funds from a counter-party (such as Barclays) who receives, in exchange for a loan, a security interest in the security to be purchased. More specifically, in exchange for the counterparty providing the borrower/purchaser with loan proceeds that it uses to complete its purchase, the borrower/purchaser typically transfers the purchased security to the counterparty. After an agreed-to period of time, the borrower/purchaser then repurchases the security from the counterparty. The repurchase price typically consists of the principal amount the buyer originally received plus interest that has accrued at an agreed-to rate.

A.  **Plaintiffs' Respective Repurchase Agreements With Barclays.**

15. At different times between 2005 and 2006, each Plaintiff entered into its own "Master Repurchase Agreement" with Barclays, each agreement being supplemented by certain annexes attached thereto (each a "Repurchase Agreement" and, collectively, the "Agreements"). Luminent's Repurchase Agreement was dated June 27, 2005; Minerva's and Mercury's respective Repurchase Agreements were each dated December 22, 2005; and Saturn's Repurchase Agreement was dated August 25, 2006.

16. Under Section 1 of the Agreements, Plaintiffs could execute repurchase transactions with Barclays from time to time, wherein Plaintiffs would transfer to Barclays securities in exchange for a payment, "with a simultaneous agreement by [Barclays] to transfer to [Plaintiffs] such securities at a date certain or on demand, against the transfer of funds by [Plaintiffs]." The security "transferred" to Barclays would, in effect, serve as collateral for the funds transferred to Plaintiffs until the date Plaintiffs repurchased from Barclays the previously "transferred" security.

17. Section 3 of the Agreements provided that "[a]n agreement to enter into a [repurchase] Transaction may be made orally or in writing."

18. Section 4 of the Agreements provided that in the event the market value of any security so transferred to Barclays diminished beyond a certain agreed-to level, Barclays could issue a "margin call" and thereby require Plaintiffs to post additional collateral or cash.

19. The Agreements endowed Barclays with much control over the securities "transferred" to it with respect to the determination of their value and their disposition in the event of an unsatisfied margin call. However, in determining the value of securities "transferred" or other collateral posted, Barclays was required to act in a commercially reasonable manner and in good faith at all times.

20. Section 11 of the Agreements provided that, should Plaintiffs fail to meet a margin call, Barclays could declare an "Event of Default" and then attempt to liquidate the collateral (and credit Plaintiffs in the amount of liquidation proceeds received) or, in the event the collateral is not liquidated, credit Plaintiffs in the amount of the collateral's true value. In such case, Barclays would be required to act in a commercially reasonable manner, and act in good faith at all times and in all respects.

B. **The Repurchase Transactions and the Subsequent Market Downturn.**

21. In accordance with their respective repurchase agreements, on various dates during 2006 and 2007, Plaintiffs executed repurchase transactions with Barclays regarding the financing of certain bonds that were still the subject of such transactions with Barclays in early August of 2007. In addition, at various other times, certain of Plaintiffs had posted other bonds with Barclays which served as additional collateral regarding certain of those bonds Barclays had financed, and that were still serving as additional collateral in early August of 2007 (such

additional bonds and the aforementioned bonds that Barclays had financed, collectively, the "Bonds").

22. On August 2, 2007, Barclays issued margin calls with respect to the Bonds it had financed – purportedly to cover a shortfall in the value of such bonds and the additional ones posted with it as collateral – ultimately demanding an unreasonable total of approximately $35 million in margin payments from Plaintiffs. Barclays' margin demands coincided with a major seizing-up of the bond market the next day (August 3, 2007) against the backdrop of a perceived crisis concerning the so-called "sub-prime" mortgage loan market.

23. Aware that the Bonds were much more valuable than Barclays was representing them to be, Plaintiffs ultimately refused to simply submit to Barclays' unreasonable margin demands.

    **C.**    **Barclays' Subsequent Breaches – Its Phony Liquidation Efforts and Wrongful Confiscation of the Posted Bonds' Value At Artificially Low Prices.**

24. On August 8, 2007, Barclays transmitted a letter declaring the occurrence of an "Event of Default" under Section 4 of the Agreements as a result of the unmet margin demands.

25. Plaintiffs were subsequently informed that Barclays had supposedly attempted to liquidate the Bonds.

26. However, despite Plaintiffs' repeated requests, Barclays failed to provide it with any form of an accounting concerning its purported liquidation efforts until September 10, 2007, when it transmitted a separate letter to each of the Plaintiffs demanding in each case a payment of a certain "close-out deficit" amount. The "close-out deficit" amounts Barclays demanded ranged from between approximately $1.23 million and $3.39 million, and totaled approximately $9.61 million.

27. The only information Barclays provided Plaintiffs regarding its purported liquidation results and efforts was that which appeared in a spreadsheet that was attached to each of its September 10, 2007 demand letters. Those spreadsheets contained a column that, in certain cases, indicated that some completely unidentified "3rd Party" supposedly bought the listed/posted bond, and in certain other cases, did not even say "3rd Party" but was left blank (which presumably meant that such bonds were not sold at all, but were merely assigned a value by Barclays for which Plaintiffs received a credit).

28. Barclays' September 10 letters contained no information regarding the identity of the supposed "3rd Party" buyers of the Bonds, or Barclays' purported liquidation efforts regarding any of the Bonds, whether supposedly "sold" to a "3rd Party" or not – e.g., to whom it tried selling any of the Bonds and when.

29. Moreover, with respect to certain of the Bonds that were noted as having been purportedly sold to an unidentified "3rd Party" buyer, the supposed sale price was clearly false and could not represent a true sales price, assuming such bonds actually were sold to a "3rd Party" at all. In either situation, Luminent was not being properly credited for the full value of such bonds.

30. For example, one of the Bonds supposedly sold to a "3rd Party" is a bond that was the subject of Minerva's repurchase transactions with Barclays, and that was issued by Fremont NIM Trust 2006-B and known as "FRENTFRN-0911a" while bearing CUSIP number "357524AA5" (the "FRENTFRN Bond"). The repurchase transaction relating to the FRENTFRN Bond had a 30-day term such that Minerva would repurchase it on August 17, 2007 for the principal amount borrowed, plus accrued interest at a rate of 5.47% per annum.

7

31. At the time of the repurchase trade, the FRENTFRN Bond had a current face amount of $9,000,000, and was a very solid credit rated "AA" by Standard & Poor's.

32. However, Barclays' September 10 letter to Minerva indicated that it sold the FRENTFRN Bond to a "3rd Party" for a cash price of merely $9 (per $100 of the bond's face amount). In fact, no such actual, *bona fide* sale could have possibly occurred as that bond was then worth approximately ten times such price.

33. In fact, there actually was no such "3rd Party" buyer for the FRENTFRN Bond. Rather, Barclays simply kept the bond for itself and then credited Minerva in the amount of only $9 (that is, 9 cents on the dollar) regarding such posted bond. As a result, Barclays confiscated for itself approximately $5,000,000 of that bond's value (whose principal amount was then approximately $6 million).

34. Similarly, the September 10 demand letter to Luminent indicated that it had sold to an unidentified "3rd Party" buyer – for merely $24 (per $100 of the bond's face amount) – a $8,000,000 bond issued by RAMP Series 2005-RS6 Trust, known as "RAMPFRN-0635" and bearing CUSIP number "76112BUB4" (the "RAMPFRN Bond"). In fact, $24 could not have been a *bona fide* sale price as the RAMPFRN Bond was actually then worth approximately three times such price. As a result, Barclays confiscated for itself approximately $4,000,000 of that bond's value.

35. Indeed, Barclays did not attempt to liquidate or valuate certain of the Bonds (as applicable) in a commercially reasonable manner or otherwise in good faith, and tried to conceal its sham liquidation and valuation efforts by ignoring repeated requests to provide Luminent with basic information regarding its supposed "sales" and otherwise provide an accounting of its supposed liquidation and valuation efforts.

36. And, as was evident in the case of the FRENTFRN Bond and the RAMPFRN Bond, the purported sale and/or sale price was a total fabrication – Barclays claimed to have sold such bonds for a mere tiny fraction of their value.

37. Barclays' representations regarding the results of its supposed liquidation efforts, and the values it assigned to those Bonds it did not purport to sell to a "3rd Party," were false. Indeed, Barclays was simply exploiting an aberrational market as a pretext to unreasonably mark down the purported value of the Bonds, demand an unreasonable amount of additional collateral from Plaintiffs, and then confiscate a portion of the value contained in certain of the Bonds by either falsely claiming to have sold them at an artificially low price, or by assigning unreasonably low values to them.

**D.   Barclays' Prior Breach of Saturn's Repurchase Agreement.**

38. Defendant's August breaches, however, do not represent the first time it had breached one of the Agreements.

39. On June 27, 2007, Saturn arranged for financing, starting July 30, 2007, from Barclays regarding a bond issued by Barclays itself, having a face amount of $150,000,000, and known as "BCAP 2007-AA4 IIA" (herein, the "Barclays Bond"). The repurchase transaction would have a 30-day term and require Saturn to pay Barclays interest at the rate of LIBOR plus 3 basis points, and the Bond was valued at 97.5% of its face amount – a 2.5% "haircut," which is a form of price protection bargained for by Barclays.

40. At the time that it had executed the repurchase transaction for the Barclays Bond, Mercury already had $77,000,000 of outstanding repurchase transactions with Barclays (pursuant to its Repurchase Agreement) relating to certain other ("mezzanine level") bonds.

41.  A month later, on July 27, 2007, Minerva sought to arrange financing for a different bond. That bond, known as "LUM 06-5 A1A," had a face amount of approximately $150,000,000 and was rated "AAA" (herein, the "Luminent Bond"). Minerva called Barclays' "repo desk" and asked if Barclays would enter into a repurchase transaction (pursuant to its Repurchase Agreement) with respect to such bond.

42.  Barclays ultimately agreed that the Luminent Bond would be financed with a 90-day term, at a 5.41% interest rate with a 2.5% "haircut." That trade was executed on July 27, 2007.

43.  In addition, because the initial 30-day financing term for the Barclays Bond was expiring and the parties had already agreed on June 27 to finance that bond, Saturn requested on July 30, 2007 that such bond also be financed with a 90-day term as was just executed with respect to the Luminent Bond.

44.  Barclays agreed, and so that trade was orally executed by the parties, as permitted under the parties' Repurchase Agreement.

45.  Later that same day, however, Barclays breached the parties' agreement, giving the excuse that its "credit desk" supposedly would not approve of the financing for the Barclays Bond after all, as doing so would put Mercury, Minerva and Saturn (as a whole) over their purported credit limit of $150,000,000 for certain longer term committed trades.

46.  Barclays' excuse for reneging on its agreement was remarkable in that it had never previously mentioned any "credit limit," let alone one set at $150,000,000. Indeed, Barclays' explanation was clearly false in that, if there were any such limit, it would have already been effectively exceeded twice without any mention by Barclays of any "credit limit" – *i.e.*, it would have been exceeded when Barclays previously agreed to finance the Barclays Bond

(on June 27) and the Luminent Bond (on July 27) while $77,000,000 of repurchase financing was still outstanding with respect to certain other (mezzanine level) bonds it had financed for Mercury.

47.     Faced with Barclays' breach, Saturn was forced to enter into a 1-day term repurchase transaction for the Barclays Bond and to try to seek alternate financing for the Luminent Bond. Meanwhile, because Barclays had effectively refused to finance the Barclays Bond on the terms it had previously agreed to (i.e., 90 day term at 5.41% interest rate with a 2.5% "haircut"), Saturn requested three days later, on August 2, that Barclays provide it with a bid to simply buy the Barclays Bond back from Saturn.

48.     In response, Barclays insisted on paying merely 98.375% of the bond's face amount, notwithstanding the fact that this was a new bond that Barclays itself had issued approximately 30 days earlier, with no delinquency or other data to support such a reduction in value by Barclays.

49.     Due to Barclays' breach and refusal to finance the Barclays Bond, Saturn was forced to accept Barclay's demand to purchase that bond at the inappropriate price it had offered.

### FIRST CAUSE OF ACTION
### Breach of Contract

50.     Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 49 as if set forth fully herein.

51.     Each Repurchase Agreement is a valid, binding and enforceable contract, supported by good and valuable consideration, that required Defendant to act in a commercially reasonable manner with respect to the valuation and any liquidation of any bonds Plaintiffs had posted with it.

52. Defendant breached these contracts by, *inter alia*, (1) improperly valuating the Bonds at artificially low prices; (2) wrongfully triggering margin calls; and/or (3) misrepresenting its liquidation results/efforts, or assigning false values, with respect to certain of the Bonds in order to confiscate a significant portion of their value for its own account (while crediting Plaintiffs in the amount of its false and/or artificially low prices/values).

53. As a result of the foregoing breaches, Plaintiffs have suffered and will continue to suffer damages.

## SECOND CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing

54. Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 53 as if set forth fully herein.

55. Each Repurchase Agreement required Defendant to act in all instances in good faith in accordance with the implied covenant of good faith and fair dealing.

56. Defendant breached each contract's implied covenant of good faith by, *inter alia*, (1) improperly valuating the Bonds at artificially low prices; (2) wrongfully triggering margin calls; and/or (3) misrepresenting its liquidation results/efforts, or assigning false values, with respect to certain of the Bonds in order to confiscate a significant portion of their value for its own account (while crediting Plaintiffs in the amount of its false and/or artificially low prices/values).

57. As a result of the foregoing breaches, Plaintiffs have suffered and will continue to suffer damages.

## THIRD CAUSE OF ACTION
### Unjust Enrichment

58. Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 57 as if set forth fully herein.

59. Plaintiffs "transferred" the Bonds to Barclays solely for the purpose of serving as collateral and subject to their right to retake possession in exchange for the principal amount borrowed from Barclays, plus accrued interest. In the event the collateral was fairly deemed to be insufficient and resulted in a margin call that was not met, Barclays could opt to declare an "event of default" and either liquidate the bonds or credit Plaintiffs in the amount of the Bonds' true value, but at all times and in all respects acting in a commercially reasonable manner and in good faith.

60. Instead of properly valuating the Bonds to begin with, Defendant made unreasonable margin demands and then represented that it would attempt to liquidate all of them in a commercially reasonable manner and in good faith.

61. In fact, as Barclays was well aware, the Bonds actually had a market value much higher than the prices at which Barclays purported to have sold them to certain (completely unidentified) third-parties, or in the case of Bonds that it did not claim to have sold, the amounts/values for which it credited Plaintiffs for such Bonds. Indeed, Barclays was simply trying to confiscate a significant portion of certain of the Bonds' value (while crediting Plaintiffs in the amount of its artificially low prices) by exploiting an aberrational market with its unreasonable margin demands and phony liquidation and valuation results and efforts.

62. By reason of the forgoing acts of confiscating a portion of the value of certain of the Bonds at a false and/or unreasonable price, Barclays has been unjustly enriched at Plaintiffs'

expense by wrongfully taking for itself certain of the Bonds' value and then crediting Plaintiffs for a mere fraction of those Bonds' actual worth.

63. In addition, by breaching its agreement with Saturn to finance the Barclays Bond, Defendant ultimately forced Saturn to sell such bond back to Defendant at an artificial discount on a new bond that Barclays itself had issued approximately 30 days earlier – with no delinquency or other data to support such a reduction in value by Barclays – thereby unjustly enriching Barclays at Saturn's expense.

64. As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs have suffered and will continue to suffer damages.

### FOURTH CAUSE OF ACTION
#### Accounting

65. Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 64 as if set forth fully herein.

66. In the event of an unsatisfied margin call under the Repurchase Agreements, Defendant was required to, among other things, sell any collateral posted with it, if at all, only in a commercially reasonable manner and act in all instances in good faith. Defendant was then required to credit Plaintiffs for the amounts received in such sales. With respect to Bonds that were not sold to third-party buyers, Defendant was required to credit Plaintiffs for the fair value of such Bonds. In either case, the amount credited to Plaintiffs should have taken into account, among other things, any principal or interest received on the Bonds by Defendant.

67. Defendant has a duty to provide Plaintiffs with sufficient information to enable Plaintiffs to corroborate the amounts, if any, actually received by Defendant, or to review its purported liquidation and valuation efforts regarding any of the Bonds, but has failed to do so. Such fundamental information is required in order for Plaintiffs to determine whether Defendant

acted in a commercially reasonable manner, and in good faith, as well to determine the amount of credit Plaintiffs was entitled to receive. In addition, Defendant's September 10 demand letters failed to provide certain basic information regarding the Bonds, and failed to explain certain terms appearing in such letters.

68. For example, Defendant has refused to provide a description of any potential third-party buyers it may have approached regarding the bonds. Indeed, Barclays failed to even provide the identity the "3rd Party" buyers of the Bonds it supposedly did locate, or a copy of the trade tickets relating to such purported sales. It also failed to confirm that the blank entries in its spreadsheets' "buyer" column meant that Barclays attempted to locate a third-party buyer but was unable to do so, or to provide the basis for the unreasonably low values it assigned to the Bonds it did not purport to sell to a "3rd Party." In addition, Barclays failed to provide any information indicating the amount of any principal and interest received by Barclays with respect to each of the Bonds, and failed to identify the "Non Collateral Structured Repo Closeout" amounts referenced in its September 10 demand letters.

69. Plaintiffs have demanded that Defendant account to Plaintiffs regarding its liquidation efforts with respect to all of the Bonds, and fully explain all amounts received with respect to the Bonds and referenced in its demand letters. Defendant, however, has failed and refused and continues to fail and refuse to render an appropriate accounting, or to fully credit and pay the monies now due to Plaintiffs following Defendant's supposed liquidation and/or misappropriation of the Bonds.

70. Accordingly Plaintiffs hereby demand an accounting of any amounts received, and/or attempted to be received, by Defendant with respect to all of the Bonds from any third-parties.

## FIFTH CAUSE OF ACTION
### Breach of Contract – Saturn's Repurchase Agreement

71. Plaintiffs restate and reallege the allegations set forth in Paragraphs 1 through 70 as if set forth fully herein.

72. Saturn's repurchase agreement is a valid, binding and enforceable contract, supported by good and valuable consideration, that required Defendant to honor repurchase transactions it agreed to – orally or in writing – thereunder with Saturn.

73. Pursuant to Minerva's and Saturn's respective repurchase agreements, Defendant had agreed to enter into repurchase transactions to both finance the Luminent Bond and provide extended financing for the Barclays Bond.

74. Barclays then breached Saturn's Repurchase Agreement by subsequently reneging on its agreement to finance the Barclays Bond, ultimately forcing Saturn to sell such bond back to Barclays at an artificially low discount.

75. As a result of the foregoing breach, Saturn has suffered and will continue to suffer damages.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs demand relief as follows:

(i)     Compensatory damages in an amount to be proved at trial;

(ii)    Punitive damages;

(iii)   Attorney's fees and costs of suit; and

(iv)    Such other and further relief as the Court may deem just and appropriate.

Dated:   New York, New York
         November 13, 2007

_____
Sean F. O'Shea (SO5476)
Michael E. Petrella (MP3794)
**O'SHEA PARTNERS LLP**
90 Park Avenue, 20th Floor
New York, New York 10016
Tel:   (212) 682-4426
Fax:   (212) 682-4437